UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| ALEXANDER ARMALIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NUMBER:  1:16 CV 412 |
| | ) | |
| OFFICER J. PEARSON, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## OPINION AND ORDER

*Pro se* plaintiff, Alexander Armalin ("Armalin"), claims that while he was a pretrial detainee at the Grant County Jail ("the Jail"), he was attacked by two inmates and the Defendants, all confinement officers at the Jail, failed to protect him from harm.  Before the Court is the Defendants' motion for summary judgment.  [DE 53].  Although notified of his obligation to respond on February 6, 2019 [DE 57], Armalin did not file a responsive brief.[1]  For the following reasons, the Motion for Summary Judgment will be DENIED.

## APPLICABLE STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence that demonstrate the absence of a

---

[1] Additionally, on April 9, 2019, an order denying Armalin's request for appointment of counsel was returned to the Court with a notation that "Recipient Not at this Address."  That address was the Grant County Jail.  Thus, it appears that Armalin has been released from custody but has not notified the Court of an updated address.

genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.' " *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

That a motion for summary judgment is unopposed doesn't change the summary judgment standard, and the court still conducts "more than just a cursory review of the filings" and scrutinizes the movant's factual submissions in order to "determine that the motion is sound and within the parameters of the law." *Leal v. TSA Stores, Inc.*, No. 2:13 CV 318, 2014 WL 7272751, at *1 (N.D. Ind. Dec. 17, 2014). An unopposed motion does, however, "reduce the pool" from which facts and inferences relative to the motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997). Accordingly, facts alleged in the motion are deemed admitted so long as support for them exists in the record. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission");

*Brasic v. Heinemanns, Inc.*, 121 F.3d 281, 285-286 (7th Cir. 1997) (affirming grant of summary judgment where the nonmovant failed to properly offer evidence disputing the movant's version of the facts). Mindful of these standards, the Court turns now to the facts of the case.

## **FACTUAL BACKGROUND**

Throughout 2014 and 2015, Armalin periodically resided in the Jail. During Armalin's 2015 stay at the Jail, Defendant Officers J. Pearson, Miller, Moore, Francis, and Loth all had contact with Armalin and were on duty in the days prior to the incident giving rise to this suit. This case arises from an incident at the Jail on October 15, 2015, while Armalin was incarcerated there.

Armalin was housed in block 2B with another inmate, Mitchell Carol ("Mitch"). Both Mitch and Armalin are black and were later joined in the block by a third black inmate, Trey Ferguson ("Trey"). Trey, Mitch and Armalin did not know each other prior to being housed together.

Armalin testified that he began having safety concerns when two white inmates at the Jail, Travis Tracy ("Travis") and Eric Tracy ("Eric"), were transferred into his block several days prior to the October 15 incident. Armalin stated that he did not know much or anything at all about Eric and Tracy when he was booked into the Jail in September, 2015 (Armalin Dep. at 22: "Q: So would it be fair to say that prior to the incident you didn't have any personal incident going on with them? A: No. I didn't have no issues with them at all, nothing, because I didn't know them."). It's a fair summary of Armalin's testimony to say that he had concerns about Eric and Tracy because the two expressed that they were "bored," wanted some "action," and began trying to start trouble with and between other inmates housed in that block. (Deposition of Armalin, hereafter "Armalin Dep." pp. 24-38). Armalin testified that the two threatened other inmates with

physical violence and the two were attempting to recruit other inmates to form a gang. Armalin testified that they began making racial slurs towards him and the other two black inmates in the block. He repeatedly told the Defendant Officers that Eric and Tracy were a threat to safety in the block, and specifically, a threat to Armalin. (Armalin Dep. at pp. 28-29: "I go to Officer Moore, and I tell Officer Moore like, hey, these people in here, these boys, they in here like threatening us because they talking about they ready to fight now that they got – they getting their gang together or whatever…he's saying to us, oh, we looking at him funny, you know…I'm telling him like…they talking like they want to fight us or whatever … and they want to get us out of the dorm…hey man you know these dudes are here threatening us telling us they want to fight us"; at p. 31: "I talked to an officer – the Officer Francis. I told him the next day that, you know, these guys was – that these guys was, you know, talking about they wanted to fight…"; at p. 33: So [we][2] told Officer Miller…we told them that Eric and Travis Tracy, they're in here on these street gangs or neighborhood jail gangs or whatever they is …you guys need to move this dude out of here because I'm not going to not defend myself because they're in here threatening us, talking about they're going to fight us and that they're bored."; at p. 33: "I told Officer Pearson and you know , I guess because this dude heard me and Mitchell telling the officer that, you know, that these guys need to get up out of here and these dudes heard us telling the officers, oh, that they threatening us, you know, and that we have an issue."[3]; at p. 35: "I told – Officer Francis when he

---

[2] The deposition is unclear as to who told Officer Miller since it has what appears to be a typographical error in the transcript. However, read in context with Armalin's other testimony, it appears that both Mitch and Armalin advised Officer Miller. *See* Armalin Dep at p. 32: "So we telling him, me and Mitchell Carol, are telling him together like, hey, these dudes is in here threatening us, talking about they're going to knock our heads off. They want to fight us, this and that."

[3] Armalin also testified that his race played a role in why Eric and Tracy wanted to fight him. He testified that "they just kept on antagonizing me. Like saying oh, yeah, Grant County – you know, Grant County is where we hang niggers. They did the last public lynching. You know what happens when y'all niggers get out of line…" (Armalin Dep. at 34).

was passing out the mail and then it kind of like died down… you know, me and [Mitch] and [Trey], we started being in a room and we wasn't really trying to be around them like that because we know that all the tension is always on us."

Armalin testified that when he spoke with Officer Pearson two days before the incident, "Pearson looked at us and opened the flap and was like laughing like that ain't my problem and he closed the flap and he walked off." (Armalin Dep. at p. 34). Another time, when Armalin spoke to Officer Miller, Armalin testified that Miller took it "like in a joking manner, saying that because we was big enough we should know how to defend ourself." (*Id.* at 32).

On the day of the incident, Armalin testified that Officer Loth was on duty walking on the catwalk. He stated that he was telling Officer Loth the following:

> …hey, listen, man, there's too much tension in here like. Either move me out of here or move them out of here. Like it's going to be some problems. Like I can see it. I can feel it. I know there's trouble coming. I'm not trying to even be a part of that. Like get me out of this dorm or, you know, it's going to be a fight because they keep on threatening us. They keep on telling us they're going to beat us up. They telling – they keep on saying – like the dudes in the dorm was telling us like, hey man, they saying when they jump on you – the both of the two brothers they're going to jump on you and then they're going to run over there and jump on Mitchell, then they're going to run over there and jump on Trey…

(Armalin Dep. at pp. 35-36). Armalin testified that when he told Officer Loth this information, Loth responded, "hey, man, I don't give a fuck. I'm about to quit anyway." (Armalin Dep. at p. 36).

After this conversation, Armalin testified that he went back to his room where Trey was sitting and the following events ensued:

> …Eric Tracy is just going berserk. Oh, fuck you nigger. I'm tired of you niggers. This and that…
> So out of the blue, he just swung at [Mitch] and hit [Mitch] in the face…So [Mitch] folds up on the back gate and he was like getting ready to go down…I get up and I run down the hallway, like I'm fixing to run down the hallway. So I'm kind of in-

between should I help [Mitch], like pick him up or should I just run straight and go get the officer.

So as I'm running towards the officer, [Travis and Eric], they both start beating up on Mitchell. So as I start running down the hallway, [Travis] turns around and just automatically started swinging, boom, boom, boom, boom, hitting me, hitting me. So that's when we start to fight.

(Armalin Dep. pp. 36-38). When asked further about the incident, Armalin provided this testimony:

Q:    It looks like the fight started with Mitchell and Eric?
A:    Right.
Q:    And then you and Trey got involved after those two kind of started up?
A:    Right.
Q:    Officers then came in, break everybody up; right?
A:    Right.

(Armalin Dep. at 37-38).

According to the Defendants, a video review of the incident shows the fight beginning between Mitch and Eric with Armalin "voluntarily" joining the fighting after the altercation started. Curiously, however, that video has not been presented to the Court as part of the Defendants' designation of evidence.

Defendants also point out that per Jail policy, Armalin had the ability to file a written grievance if he believed his personal safety was threatened. (Albertson Aff. ¶8). In fact, prior to the October 15, Armalin submitted five separate grievances none of which related to personal safety issues or referenced the incidents he testified to in his deposition. (*Id.* at 11). Thus, it is the Jail's position that there is no record of Armalin expressing concerns for his safety to the Jail.

## DISCUSSION

To recover under 42 U.S.C. § 1983, a plaintiff "must demonstrate that the individual defendants: (1) acted under the color of state law; and (2) deprived him of a constitutional right." *Estate of Perry v. Wenzel*, 872 F.3d 439, 452 (7th Cir. 2017) (citing *Colbert v. City of Chicago*,

851 F.3d 649, 656 (7th Cir. 2017) ).   There is no question that the Officers at the jail were acting under color of state law.  Thus, the remaining question, and the one of paramount importance here, is whether the Officers' acts of failing to respond to Armalin's repeated concerns for his safety from Eric and Travis violated his rights under the Fourteenth Amendment. [4]

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515, 517 (7th Cir. 2002). "[I]n order to state a section 1983 claim against prison officials for failure to protect, [a plaintiff] must establish: (1) that he was incarcerated under conditions posing a substantial risk of serious harm and (2) that the defendants acted with deliberate indifference to his health or safety." *Santiago v. Walls,* 599 F.3d 749, 756 (7th Cir. 2010). The plaintiff must establish "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Id.*   In failure to protect cases, substantial risks are ones "so great that they are almost certain to materialize if nothing is done." *Brown v. Budz,* 398 F.3d 904, 911 (7th Cir. 2005). In such cases, "a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). General requests for help and expressions of fear are

---

[4] It is important to note this distinction, as prisoners and pretrial detainees derive their constitutional rights from different sources:

> The Eighth Amendment's prohibition on cruel and unusual punishment gives rise to the constitutional rights of a convicted state prisoner. A pretrial detainee's constitutional rights are distinct from a prisoner's rights because the State cannot punish a pretrial detainee. Thus, the source of the pretrial detainee's rights is the Fourteenth Amendment's Due Process Clause ....

*Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 259 n. 1 (7th Cir.1996) (citations omitted).

insufficient to alert guards to the need for action. *Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008).

Defendants move for summary judgment on Armalin's claim asserting first that they are entitled to qualified immunity and second, that there is no evidence of a constitutional violation. For reasons further clarified herein, the Court reviews these arguments in reverse order.

### A. Fourteenth Amendment Claim

A jail officer may be liable for his deliberately indifferent "fail[ure] to protect an inmate from another prisoner" if the officer " 'knows of and disregards an excessive risk to inmate health or safety[.]'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837). Such a claim "has both an objective and a subjective component." *Id.* (citing *Farmer*, 511 U.S. at 837).

First, the risk "must be an objectively serious one." *Id.* (citing *Farmer*, 511 U.S. at 837). Second, the officer "must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.' " *Id.* (quoting *Farmer*, 511 U.S. at 837). This presents "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a [jail officer] knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted).

As to the allegation of serious harm, the Supreme Court has made clear that "the deprivation alleged must be objectively, sufficiently serious," amounting to a "denial of the minimal civilized measure of life's necessities." *Id.* (citations and internal quotations omitted). "[A] beating suffered at the hands of a fellow detainee clearly constitutes serious harm." *Brown*,

398 F.3d at 910. Indeed, "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer,* 511 U.S. at 834, (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

Here, the harm Armalin alleges was about to befall him was a beating at the hands of two specific detainees in his cell block. And, crediting Armalin's recitation of the events in the days leading to the assault, which included racial slurs and comments that Armalin had snitched to the Officers, the Court assumes that a reasonable jury could find not only the magnitude of the risk, but also its likelihood to be objectively sufficiently serious. *See Williams v. Castellon,* 2018 WL 4593495 (S.D.Ind. September 25, 2018) and *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008) (retaliatory assault sufficiently serious risk of harm). Thus, Armalin meets this first prong of the analysis.

To meet the second, subjective prong of a failure to protect claim, a plaintiff must establish his custodians' deliberate indifference to that substantial risk of serious harm. As the Court stated in *Farmer,* "a prison official cannot be found liable ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 838.

Here again, Armalin has raised a genuine issue of material fact as to whether the Defendant Officers knew of a substantial risk of harm to the Plaintiff and ignored it. While the Plaintiff is both unrepresented and failed to respond to the Motion for Summary Judgment, that does not eliminate this Court's obligation to examine the record in its entirety. Defendants submitted Armalin's deposition wherein he states clearly that he informed each of the Defendant Officers that he was being threatened with physical harm by Travis and Eric. He did this on successive

days in the week before the incident. Additionally, Armalin testified that at least some of the Officers did not take his complaints seriously, even laughed when he made them. However, Defendants have failed entirely to address these portions of his deposition nor have they supplied *ANY* evidence to dispute what Armalin says he told them. There is not one assertion in an affidavit or testimony from *ANY* of the Defendants calling into question that they were informed by Armalin that he was being physically threatened on a regular basis. In fact, there is absolutely no testimony or sworn statement from ANY of the Defendants at all. Thus, reading the record in a light favorable to the Plaintiff as the Court must, a genuine issue of material fact exists as to whether the Officers knew of the risk of harm to Armalin (because, as he testified, he told them) and did nothing.

In spite of the above, the Defendants argue that Armalin cannot show the defendants knew of a substantial risk of serious harm because he only told the officers of a generalized or vague concern to his safety and this is insufficient for him to survive summary judgment. *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (plaintiff must complain about a specific threat to his safety). However, this is not borne out in the record. Armalin testified that he told the Officers of a specific threat and identified the two prospective assailants, Eric and Travis ("I am being threatened;" "They are going to knock our heads off.").

In *Gevas v. McLaughlin*, 798 F.3d 475, 480–81 (7th Cir. 2015), the court compared cases in which the evidence had been sufficient to show the defendants' knowledge of a risk with cases in which the evidence was not sufficient. For example, in *Gevas* itself, the plaintiff alleged that he had told the defendants that his cellmate was threatening to stab him. 798 F.3d at 481–82. And in *Haley v. Gross,* the plaintiff told the defendant that his cellmate had threatened that "something crucial was going to happen" if one of them was not moved. 86 F.3d 630, 643 (7th Cir. 1996).

Those allegations were sufficient because the plaintiff identified a "specific, credible, and imminent risk of serious harm." *Gevas*, 798 F.3d at 481; *contrast with*, *Schroeder v. Sawall*, 2017 WL 6805630 (E.D. WI. September 26, 2017)(absence of specific, credible harm to safety and failure to identify a prospective assailant insufficient), *Klebanowski v. Sheahan*, 540 F.3d 633, 639–40 (7th Cir.2008) (beyond expressing fear for his life, prisoner's statements to guards did not identify who was threatening him or what the threats were); and *Grieveson v. Anderson*, 538 F.3d at 776 (7th Cir. 2008) ((prisoner did not mention to guards that he was perceived to be a "snitch" or otherwise apprise them of a specific threat to his life). Here, a jury could certainly conclude that Armalin provided a specific, credible risk of harm by two specific individuals, what the harm was (being beaten), and provided context rendering the threats plausible (racist slurs, being accused of snitching to guards.[5] Nothing in the Fourteenth Amendment requires Armalin to be clairvoyant and detail the exact time, location or extent of the violence he perceives by threats against him. Accordingly, the Court concludes that a reasonable jury could find that Armalin's statements were sufficiently specific to put the Officers on notice that action was needed to avoid harm.

Defendants also contend that if Armalin *really* felt fearful of his safety, he was aware of the grievance procedure, had utilized it five times in the month preceding the incident and could have filed a grievance. They assert that because he did not file a grievance he did not view the threat to his safety as imminent. This argument bolsters this Court's conclusion that questions of

---

[5] It is worth noting that the Defendants do not make any argument with respect to themselves individually. For instance, Officer Pearson makes no individual argument that the facts relayed to him by Armalin were insufficient to warrant a concern because they were too vague. This appears to be because the Defendant Officers completely ignore all of Armalin's deposition testimony pertinent to this issue. At trial, however, the evidence may very well support a directed verdict in favor of some of the Defendant Officers if there is no evidence that Armalin provided sufficiently detailed and specific information to each of them.

fact preclude summary judgment. Armalin testified that he told all the Defendant Officers of a specific threat to his safety, presumably so they would take action to protect him. Armalin's reasons for not filing a grievance (perhaps he thought the Officers were documenting his complaints; perhaps he did not think he needed to file a grievance) may well be relevant to the jury's assessment of his credibility and are ripe for cross-examination at trial. But these are jury determinations and on the basis of the current record, the Court cannot grant summary judgment.

Finally, the Defendants assert that no constitutional right of Armalin's was violated because he was not actually attacked; rather, the Defendants contend he "voluntarily engaged in fighting once an altercation began." Brief at p. 6. As this argument goes, the Defendants assert that Armalin admitted running towards the altercation between Eric and Mitch when it began and thus, he voluntarily stepped into the fight. Because he was voluntarily entering the fray, the Defendants argue he was not attacked but an aggressor and thus, there was no failure to protect him. In addition, the Defendants assert that a video of the events shows Armalin running towards the altercation thereby proving he volunteered to fight.

In assessing this argument, the Court begins with what is absent from the record – namely, the video of the event and any statements from anyone present at the scene aside from the Plaintiff. The Defendants did not proffer the video for the Court to review. Instead, the Defendants proffer an affidavit from a captain in the Grant County Jail as to his opinion of what the video shows. (Albertson Aff. ¶13: "A video review of the incident shows the altercation on October 15, 2015 started between inmates [Mitch] and [Eric], then Mr. Armalin voluntarily joined the fighting after the altercation started."). This is not helpful as the content of video evidence speaks for itself. Indeed, not even experts are permitted to offer opinions of their interpretation of videos. *See Munoz v. Menard, Inc*., No. 18 CV 2571, 2019 WL 2994519, at *3 (N.D. Ill. July 9, 2019) (holding that

a witness' testimony is not needed to explain to the jury what the surveillance footage depicts) citing *Clement v. Stanley Access Techs. LLC*, 2016 WL 4443702, at *2 (W.D. La. Aug. 19, 2016). ("[T]he surveillance video speaks for itself, and [the expert] may not offer opinions based on his interpretation of the video.").

Moreover, the probative value of the video, even if it was submitted to the Court is questionable. Armalin admits running toward Mitch in his deposition, which is precisely what the Defendants say the video depicts. However, Armalin further indicates that when he ran in that direction to assist Mitch, Mitch continued to be attacked and then he, himself, was punched repeatedly by Travis. Thus, whether Armalin was running to "engage" in the fight rather than assist Mitch who was on the ground and became part of the attack, is a question of fact for a jury to determine.[6]

In sum, taking the facts in the light most favorable to Armalin, a jury could reasonably conclude that the Defendant Officers violated Armalin's Fourteenth Amendment rights by failing to protect him from a known threat of which he made them aware.

## B. Qualified Immunity

Turning next to the Defendants claim that they are entitled to qualified immunity, "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). In other words, qualified immunity "shields from liability police officers 'who act in ways they

---

[6] But this begs the ultimate question here. Armalin's claim appears to be that the altercation never should have happened in the first place, whether he was part of it or not because he repeatedly warned the Officers that Eric and Travis were looking to fight he and Mitch. Thus, it would appear his position is that the Officers should have acted well before the fight broke out to separate Eric and Travis from him.

reasonably believe to be lawful.' " *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Qualified immunity is an affirmative defense, but the plaintiff carries the burden of defeating it once it is raised. *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013). To defeat the qualified immunity defense, a plaintiff must show: (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation. *Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). These questions can be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *Locke v. Haessig*, 788 F.3d 662, 667 (7th Cir. 2015).

The Court has already concluded that whether Armalin's Fourteenth Amendment rights were violated by the failure of the Officers to take the threat to his safety seriously is a jury question to be resolved at trial. Moving onward then, the next step in the qualified immunity analysis is whether the law was clearly established at the time of these events. The Defendants make no argument whatsoever that the law pertaining to the duty of prison officials to protect prisoners from violence by other prisoners is not well-established. Indeed, that would be futile since the Supreme Court said as much in *Farmer v. Brennan*, 511 U.S. at 833. And while some circuits have found the parameters of this basic principle more difficult to define, for instance, when a claim arises from a surprise attack by fellow inmates about which officers had no warning, *see Tucker v. Evans,* 276 F.3d. 999 (8th Cir. 2002); here, there has been no assertion by the Defendants that the attack at issue was a surprise attack, nor would it warrant summary judgment if it had been made. The record is replete with statements by Armalin that he warned the Officers that he was going to be attacked or that some sort of fight was brewing in the block all of which must be

evaluated by a factfinder. Contained within those questions of material fact is the Defendants' argument that the Plaintiff voluntarily engaged in fighting, which may give way to a finding that qualified immunity applies to the Officers.[7] For this reason, the Court finds that genuine material fact issues preclude a determination of whether the Defendant Officers are entitled to qualified immunity.

## **CONCLUSION**

Based on the foregoing, the Defendants' Motion for Summary Judgment [DE 53] is DENIED. However, the undersigned takes judicial notice that a previous Order, dated March 12, 2019 [DE 59] was returned to this Court on April 9, 2019 with a notation "Return to Sender Recipient Not at this Address." [DE 60]. Plaintiff has failed to keep this Court apprised of his current address, and there is no indication that he has taken any further steps to prosecute this case as he did not file a response to the Motion for Summary Judgment.

It is incumbent upon any litigant, including a pro se prisoner litigant, to keep the Court apprised of his current address. While some latitude may be extended to pro se litigants, "[o]nce a party invokes the judicial system by filing a lawsuit, it must abide by the rules of the court; a party can not decide for itself when it feels like pressing its action and when it feels like taking a break[.]" GCIU Emp'r Ret. Fund v. Chi. Tribune Co., 8 F.3d 1195, 1198-99 (7th Cir. 1993). Under Rule 41(b) of the Federal Rules of Civil Procedure, a court may dismiss any case for "failure of the plaintiff to prosecute or to comply with the rules or order of the court...." Unless the court orders otherwise, a dismissal for failure to prosecute pursuant to Rule 41(b) is an adjudication on the

---

[7] The Defendants argue that *Giles v. Tobeck*, 895 F.3d 510 (7th Cir. 2018) supports their claim that they are entitled to qualified immunity if a jury finds that Armalin intervened in the attack. This Court's reading of the *Giles* case does not support this conclusion. *Giles* held that the undisputed evidence showed that the defendant officers responded reasonably to protect the plaintiff once a fight broke out. Qualified immunity was not addressed in the opinon.

merits that is to be given preclusive effect, barring subsequent actions based on the same allegations. Fed.R.Civ.P. 41.

The Seventh Circuit has suggested several factors for the district court to consider when deciding whether to dismiss a case for want of prosecution. *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 561 (7th Cir. 2011). Such factors include, but are not limited to, the overall merit of the suit, and whether the misfeasance is attributable to the plaintiff himself or his lawyer. *Id.*

Here, this Court has concluded that a jury trial is warranted on the Plaintiff's claim under the Fourteenth Amendment. For this reason, the Court will not dismiss the Plaintiff's claim at this time. A copy of this Opinion and Order shall be mailed to the Plaintiff at the last address provided. The Clerk is DIRECTED to notify the Court if the mailing is returned to the Court. The Plaintiff is further ORDERED to SHOW CAUSE by filing with the Court within 30 (thirty) days a current address and a statement as to why his case should not be dismissed for want of prosecution. Without such basic information as a current address from a plaintiff, a court has no recourse but to dismiss a complaint for failure to prosecute. No further scheduling will proceed with this case until the Court receives a response to the Show Cause order or the time period for a response expires.

Entered: This 22nd day of July, 2019.

s/ William C. Lee
United States District Court